NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SERVICE GARAGE, INC., Respondent.

No. 80–1298.

United States Court of Appeals,
Sixth Circuit.

Jan. 5, 1982.

Elliott Moore, Andrew Tranovich, N. L. R. B., Washington, D. C., for N. L. R. B.

Donald R. Wellford, Boone, Wellford, Clark, Langschmidt & Pemberton, Memphis, Tenn., for respondent.

Before MERRITT and KENNEDY, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

## ORDER

On February 7, 1980, the National Labor Relations Board found that respondent Service Garage committed unfair labor practices during an organizing campaign in violation of Sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., by denying employees an expected pay raise during the campaign and by laying off one union adherent and discharging another. The Board ordered reinstatement with back pay of the two disciplined employees, payment of the wage increase, the posting of a notice and other incidental relief. The Board's order is reported at 247 NLRB No. 115 (1980). The Board issued a supplemental order after it received newly discovered evidence in which it rescinded the reinstatement and back pay award to the discharged employee but otherwise affirmed the original remedy. The supplemental order is reported at 256 NLRB No. 153 (1981). The Board petitions for enforcement of its supplemental order. Respondent Service Garage contends that the Board's findings are not supported by substantial evidence.

Service Garage was founded to service the equipment of four companies owned by a Mr. Hollis and a Mr. Bell. It later expanded to take in outside business as well. A Mr. Scott managed Service Garage from 1977 to January 23, 1979 with full authority to hire and fire employees, as well as to grant wage increases. Service Garage employed a total of twelve persons in December, 1978. In December, all twelve employees signed authorization cards for the Highway & Local Motor Freight Employees Union. Scott learned of this from employee Holt in the last week of December, and on December 29, 1978, the Union sent a bargaining demand to Hollis. When the company did not respond to this demand by January 2, 1979 the Union filed a representation petition.

The Board's complaint alleged that the employees of Service Garage expected to receive a 7% cost of living wage increase in early January, 1979, and that the company refused to grant this increase upon learning of the employees' attempt to unionize. The Administrative Law Judge (ALJ) found that the company did not have any past practice of granting cost of living increases. The ALJ noted that there were rumors among the employees that they would receive a 7% increase, but that these rumors had no concrete source. The only concrete evidence cited by the ALJ relating to the company's promise to grant an increase in January of 1979 was testimony that, when asked by an employee if the union activity meant that there would be no wage increase, Scott replied in the affirmative.

The ALJ found that Scott's single, ambiguous statement did not indicate both that the company had promised its employees a cost of living increase and had decided to withdraw the increase in order to influence the outcome of the organizing campaign. The ALJ took notice of the quandary the company would be in, in the event of a contrary holding. Under Board policy, there is a presumption that the purpose of a wage increase granted during a union campaign is to interfere with the campaign, and an employer then bears the burden of rebutting this presumption, perhaps by showing that the increase was consistent with past practice. Colonial Haven Nursing Home, Inc., 218 NLRB 1007, 1008 (1975). The ALJ noted that had the employer in this case granted a 7% wage increase in January, the evidence adduced would not have been sufficient to rebut the presumption that it was interfering with the election. He concluded that it would be unfair under these circumstances also to penalize the employer for not granting the wage increase.

The Board disagreed with the ALJ. It found that Scott's statement clearly conveyed the message that the employees would have received a wage increase but for their union activities. In the light of this clear statement, it found the company's past practices immaterial. It concluded somewhat simplistically that the company did not face the dilemma outlined by the ALJ because it was only required to act as if there were no union.

 We find that Scott's statement is not substantial enough evidence viewing the record as a whole to support the Board's conclusion that a wage increase had been promised and then withdrawn because of union activities. This is particularly true in view of the ALJ's contrary decision. *See Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 496, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951). The Board failed to show sensitivity to the problem faced by an employer after *Colonial Haven.* Since the Board has placed on employers the burden of proving that wage increases granted during an organizing campaign are not motivated by a desire to influence the campaign, we must review the evidence closely where the charge is that failure to grant a wage increase during a campaign is an unfair labor practice.

The Board also found, contrary to the ALJ's conclusion, an unfair labor practice based on Scott's decision to lay off a Mr. Woods, the more junior of the company's two tire repairmen, on January 9. Woods had been recently hired, in October of 1978. At the time Woods was hired the company handled both Hollis/Bell work and outside work. This proved to be beyond the capacity of the small shop, so a decision was made to eliminate the outside work at the beginning of 1979. The testimony indicated that Woods was laid off in the expectation that tire repairs would diminish as a result of the cutback. There was no testimony to the contrary. There was also testimony that tire repair work was unpredictable. In fact, the tire repair work did not diminish after Woods was laid off, and he was called back on January 17, eight days later.

The Board reasoned that the timing of the layoff created a presumption that the purpose of the layoff was to discourage support for the union. The Board discounted the business justification for the layoff, finding it unbelievable because tire repair work did not diminish. The Board found further support for its conclusion in the company's denial of the wage increase, which the Board found demonstrated anti-union animus.

Again, the Board's decision does not find support in the record as a whole. All of the employees signed union authorization cards. Woods was one of the most junior. He was not one of the union leaders. There is no basis to believe that the layoff was to discourage union support, in the face of the company's uncontradicted business justification therefor.

Accordingly, enforcement of the Board's order is denied.